**SOUTHWESTERN ELECTRIC POWER COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Oklahoma Municipal Power Authority, Intervenor.**

**No. 86–1104.**

United States Court of Appeals, District of Columbia Circuit.

Feb. 3, 1987.

Mikva, Circuit Judge, dissented and filed opinion.

dure Act nor the fifth amendment's due process clause, and we find that the ICC made adequate

Clark Evans Downs and Carolyn Y. Thompson, Washington, D.C., were on the brief for petitioner.

William H. Satterfield, General Counsel, Jerome M. Feit, Sol., and Joel M. Cockrell, F.E.R.C., Washington, D.C., were on the brief for respondent.

Robert A. O'Neil and Jonathan S. Liebowitz, Washington, D.C., entered appearances for intervenor.

Before MIKVA, GINSBURG and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

Dissenting opinion filed by Circuit Judge MIKVA.

findings of fact and conclusions of law.

RUTH BADER GINSBURG, Circuit Judge:

In this case, we confront an attempt by the Federal Energy Regulatory Commission (FERC or Commission) to adjust to this court's decision in *Middle South Energy, Inc. v. FERC,* 747 F.2d 763 (D.C.Cir. 1984), *cert. dismissed,* —— U.S. ——, 106 S.Ct. 22, 87 L.Ed.2d 700 (1985). In *Middle South Energy,* a divided panel held that the Commission's authority under section 205(e) of the Federal Power Act, 16 U.S.C. § 824d(e) (1982), to suspend rates, and to require refunds where filed rates are subsequently found to be unlawful, extends only to "changed rates," not to "initial rates." In the instant case, petitioner Southwestern Electric Power Company (SWEPCO) challenges the Commission's novel classification of a transmission service agreement SWEPCO filed with FERC. Relying on prior Commission precedent, SWEPCO contended that its filing constituted an initial rate. The Commission rejected that contention; maintaining that SWEPCO's filing is properly characterized as a change in rate, FERC held that the rate filing in question legitimately falls within the Commission's suspension and refund order authority. Accordingly, FERC accepted SWEPCO's submission for filing, subject to a day's suspension and the possibility of an eventual refund determination.

The Commission admits that it has departed from prior practice in classifying SWEPCO's filing as a changed rate, and that an explanation is in order. We conclude that the explanation FERC offered is insufficiently clear and coherent to warrant our approbation. Unequestionably, the Commission may take a "broad view of what constitutes a changed rate." *Middle South Energy,* 747 F.2d at 771. When FERC redraws the line between initial and changed rates, however, the Commission is bound to reason why, so as to show that its new path marks out a permissible construction of the Act. FERC has not supplied, in ruling on SWEPCO's filing, an adequate justification for abandoning its own precedent, nor can we discern the contours of the line the Commission now intends to retain between initial and changed rates. We therefore vacate the orders petitioner challenges, and remand this case to the Commission for reconsideration of SWEPCO's filing and a fuller exposition of the Commission's position.

## I.

SWEPCO and the Oklahoma Municipal Power Authority (OMPA), early in 1985, entered into a Transmission Service Agreement (TSA). The arrangement involved SWEPCO's conveyance to OMPA of undivided shares in two generating units (Pirkey and Dolet Hills); the TSA specified the rates, terms and conditions for transmission of OMPA's power entitlements from the two units.

The Commission, when it accepted SWEPCO's submission, found, contrary to SWEPCO's contention, that the filing was a "changed rate" subject to FERC's suspension and refund powers.[1] This was a novel ruling. OMPA was indisputably a new SWEPCO customer; that fact alone would have supported a finding, under Commission precedent then in effect, that the OMPA TSA was an "initial rate." *See, e.g., Southern Company Services, Inc.,* 22 F.E.R.C. ¶ 61,045 at 61,082 (1983); *Southern Company Services, Inc.,* 23 F.E.R.C. ¶ 63,018 at 65,034 (1983). The Commission's principal order cited a passage extracted from *Otter Tail Power Co. v. FERC,* 583 F.2d 399, 406 (8th Cir.1978), *cert. denied,* 440 U.S. 950, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979), as authority for defining an initial rate as a *"new service* rendered to new customers."[2] SWEPCO already had on file, "based on the same cost-of-service formula," rates charged existing customers for transmission from the two generating units covered by the OMPA TSA; the Commission, on that basis, con-

---

1. Southwestern Electric Power Co. (*Southwestern*), 31 F.E.R.C. ¶ 61,389 at 61,874 (1985), Joint Appendix (J.A.) at 77.

2. *Id.* (emphasis added).

cluded that the SWEPCO–OMPA agreement did not involve a "new service," and thus did not qualify as an initial rate.[3]

SWEPCO filed a request for rehearing. The Commission adhered to its ruling. FERC acknowledged that it was "redrawing the line between changed and initial rates."[4] Without much further comment, however, the Commission reiterated its position that SWEPCO already provided "the *same* transmission service, *viz.,* transmission of power from the Pirkey and Dolet Hills units, over the same transmission lines, to other customers,"[5] so that SWEPCO's filing ranked as a changed rate. SWEPCO then filed this petition for review.

## II.

While section 205 of the Federal Power Act, 16 U.S.C. § 824d (1982), does not define either "initial" or "changed" rates, the Commission is not at liberty to blend the two. We so indicated in *Middle South Energy,* where we vacated FERC's orders and held that the statute empowers the Commission to exercise suspension and refund authority only over filings legitimately characterized as changed rates; as to initial rates, the Commission's ratemaking powers are purely prospective. *See Middle South Energy,* 747 F.2d at 772.

Having thus failed to gain this court's approval for administrative elimination of the distinction between initial and changed rates, the Commission now proposes to broaden substantially its definition of changed rates. We are mindful that "an agency is free to alter its past rulings and practices even in an adjudicatory setting." *Hatch v. FERC,* 654 F.2d 825, 834 (D.C.Cir. 1981). The agency must, however, "provide a reasoned explanation for any failure to adhere to its own precedents." *Id.; see also Atchison, Topeka & Santa Fe Ry. v. Wichita Board of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973) ("Whatever the ground for the departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.").

The Commission recognizes that its classification of the SWEPCO filing as a rate change reflects an alteration in Commission policy.[6] FERC announced the alteration with scant elaboration beyond the observation that "[a]t least one court has ventured that an initial rate is a 'new service rendered to new customers.' *Otter Tail Power Co. v. FERC,* 583 F.2d 399, 406 (8th Cir.1978)."[7] The statement in *Otter Tail* was made in passing; it determined no issue in that case.[8] What the court "ven-

3. *Id.*

4. Southwestern Electric Power Co. (*Southwestern*), 34 F.E.R.C. ¶ 61,160 at 61,272 (1986), J.A. at 111.

5. *Id.* at 61,271, J.A. at 110.

6. *Id.* at 61,272, J.A. at 111; *see also* Brief for Respondent at 15–17.

7. *Southwestern,* 31 F.E.R.C. at 61,874, J.A. at 77.

8. The *Otter Tail* decision, considered in its entirety, provides virtually no support for the Commission's current classification endeavor. Otter Tail Power Company was charging one mill per kilowatt hour for "wheeling" power— *i.e.,* transmitting power generated elsewhere—to 17 municipalities. *Otter Tail Power Co. v. FERC,* 583 F.2d 399, 401 (8th Cir.1978). Another customer, the Village of Elbow Lake, contracted for identical wheeled service, and Otter

Tail sought a rate of five mills per kilowatt hour. *Id.* Elbow Lake was at that time an Otter Tail customer receiving "wholesale" service—*i.e.,* power generated and transmitted by Otter Tail. *Id.* at 407. Otter Tail then sought permission to raise the rates charged the other 17 customers to five mills. *Id.* at 402.

The Commission first ruled "that the [wheeled] service to Elbow Lake was an initial rate for a 'new type of service,'" *id.* at 401, a ruling that was not appealed. The filing for the 17 municipalities was classified as a rate change subject to suspension, *id.* at 403, and Otter Tail appealed.

The court upheld the Commission, since "[t]here is no question that the schedule filed by Otter Tail ... was intended to 'supersede, supplement, cancel, or otherwise change'" the rates *then in effect* for the 17 municipalities. *Id.* at 406, quoting 18 C.F.R. § 35.1(c). This was not inconsistent with the classification of the Elbow Lake schedule as an initial rate, since the Elbow

tured" in *Otter Tail* is therefore an insecure foundation for the Commission's revised categorization.

The policy considerations advanced by the Commission in support of its new position are also of questionable cogency. The Commission asserts that because "the addition of a new transmission customer [*i.e.,* OMPA] may affect the current or future allocation or amount of costs to [SWEPCO's] *other* transmission customers,"[9] the OMPA TSA may "directly or indirectly creat[e] a very real change in the rate *already on file.*"[10] If this change came to pass, it would then be "incongruous indeed, if ... the rates paid by some customers for transmission service [from] the Pirkey and Dolet Hills units were reduced retroactively, while the rate to OMPA for the same transmission service could only be changed prospectively."[11]

The incongruity FERC features might be troublesome if SWEPCO's rate to *OMPA* were already on file, and if that rate, along with the rates charged SWEPCO's other customers, were altered by a schedule filed by some third-party; were that the case, OMPA and the other customers would be similarly situated for the relevant purpose, and a construction of the statute so as to accord them equal treatment might well be in order. But that is not this case; the rate to OMPA can hardly be said to have been changed by this filing, so OMPA is not in a situation similar to that of SWEPCO's other customers. It does not appear incongruous to us that existing customers whose rates turn out to be altered by this filing, who thus have bargained for one rate structure and find another applied to them, may eventually receive a refund denied

OMPA, a new customer receiving precisely what it bargained for.

We reiterated in *Middle South Energy* that placement of the line between initial and changed rates "is precisely the type of question we must leave to the technical expertise of the Commission," but we simultaneously observed that the Commission's judgment must be a reasonable one, "rationally reconciled with the terms of the [Federal Power] Act." *Middle South Energy,* 747 F.2d at 771, quoting *Florida Power & Light Co. v. FERC,* 617 F.2d 809, 815 (D.C.Cir.1980). The Act, as we construed it in *Middle South Energy,* differentiates between initial and changed rates; we cannot permit the Commission to void that distinction by defining the initial rate category in so restrictive a fashion that it virtually disappears. We have no assurance in the orders on review that the Commission has not taken the distinction to the vanishing point through dual features of its current ruling: its extension of the change in rate category to rates for new customers, and its less than crystalline delineation of what constitutes the same or sufficiently similar service.

The Commission found that OMPA, a new SWEPCO customer, would be receiving the *"same* transmission service" as that provided other SWEPCO customers, as opposed to "new service."[12] This distinction, except in the rare case where the proposed service is identical in all particulars to existing service, will be one of degree. FERC emphasizes that OMPA will receive power from units (Pirkey and Dolet Hills) and over transmission lines already serving other customers. The Commission does not claim, however, that this same-

---

Lake filing involved a "change[ ] [in] the nature of the service rendered *an existing customer,*" *id.* (emphasis added)—wholesale service changed to wheeled service—while the challenged filing did not. *Id.* at 406–08. Thus, the force of the court's observation that initial rates "would appear to be rates that are set ... to cover new services rendered *to new customers,*" *id.* at 406 (emphasis added), is diminished, for in the very case, FERC had accepted as an initial rate a filing for new service rendered an existing customer.

**9.** *Southwestern,* 31 F.E.R.C. at 61,874, J.A. at 77 (emphasis added).

**10.** *Southwestern,* 34 F.E.R.C. at 61,272, J.A. at 111.

**11.** *Southwestern,* 31 F.E.R.C. at 61,875, J.A. at 78.

**12.** *Southwestern,* 34 F.E.R.C. at 61,271, J.A. at 110.

ness suffices to place the rate to OMPA in the "change in rate," rather than the "initial rate" category. What else does FERC weigh in the balance? On that decisive matter, the Commission's orders before us are "[in]tolerably terse." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970) ("[I]f an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.") (Leventhal J.) (footnote omitted), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).

■ The Act provides some assistance in the classification endeavor at issue. It empowers the Commission to exercise suspension and refund authority only where the utility proposes "changes ... in the [rate] schedule or schedules *then in force.*"[13] Conforming to that statutory language, proposed service can be deemed the "same" as existing service only if it would be reasonable to apply the rates covering that existing service to the proposed service.[14]

Here, the Commission found that "SWEPCO had filed similar, but slightly different, rates to different customers for ostensibly the same transmission service. Thus, there *was* a rate schedule in force for the service offered, as called for by section 205 of the Federal Power Act[.]"[15] SWEPCO, however, vigorously asserts that, while there are similarities, there are also substantial differences between the service provided, and rates charged, to OMPA and to other Pirkey and Dolet Hills transmission customers. Specifically, SWEPCO alleges:

(a) Three other customers receive power from the Dolet Hills and Pirkey generating stations under "requirements contracts" whereby SWEPCO is obligated to meet all of their power demands; no similar obligation exists under the OMPA TSA.

(b) A fourth customer, Northwest Texas Electric Cooperative Inc. (NTEC), like OMPA, owns an undivided share in the Pirkey unit; however, while SWEPCO is obligated to provide backup energy to NTEC from other sources if Pirkey is out of service, it has no such obligation to OMPA.

(c) The formula rate provisions of the OMPA TSA includes 50% of SWEPCO's non-pollution control construction work-in-progress (CWIP) in rate base; CWIP is not included in rate base under the contracts with SWEPCO's other customers.[16]

From these allegations, it appears that SWEPCO has raised a colorable claim that the service to be provided to OMPA cannot reasonably be equated with the service provided to other customers. Nothing in the record suggests that FERC fairly considered these alleged service and rate differences. All that appears about them in FERC's exposition is the *ipse dixit* that "[i]n the Commission view, these alleged distinctions are more form than substance."[17] This quick brush off will not do to assure a court of review that the Commission engaged in "reasoned decisionmaking" based on "a consideration of the relevant factors." *Natural Resources Defense Council v. EPA*, 655 F.2d 318, 328 (D.C.Cir.1981), quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

## CONCLUSION

■ In the absence of a clearer exposition of the criteria FERC uses to determine

**13.** 16 U.S.C. § 824d(d) (1982) (emphasis added).

**14.** *See also* 16 U.S.C. § 824d(e) (authorizing the Commission to "defer the use of such [changed] rate" for up to five months). "Deferring" the changed rates implies that the utility can continue to charge the "old" rates during the suspension period; in a case such as OMPA's, since there are no "old" rates, the Commission presumably envisions that the new customer, during any suspension period, will be charged according to the rate schedules then in force for existing customers receiving the "same" service.

**15.** *Southwestern,* 34 F.E.R.C. at 61,271, J.A. at 110.

**16.** SWEPCO's Request for Rehearing at 8–10, J.A. at 89–91.

**17.** Brief for Respondent at 18 n. 8.

whether service is the "same" or "new," we are unable to say that the Commission has not, as SWEPCO charges, "effectively denie[d] the possibility of a utility's ever filing an initial rate." [18] We therefore return this case to FERC with instructions to clarify its position. If rates to new customers can qualify as "changed," rather than "initial," the rationale must derive from a source other than a line of unelaborated dictum in *Otter Tail.* Furthermore, the Commission must explain why apparent differences in the terms and conditions of SWEPCO's service to various customers are "more form than substance," if that is indeed the case.[19]

For the reasons stated, the orders challenged in SWEPCO's petition for review are vacated, and the case is remanded to the Commission for reconsideration consistent with this opinion.

*It is so ordered.*

MIKVA, Circuit Judge, dissenting:

In *Florida Power & Light Co. v. FERC,* this court explained that "[t]he Federal Power Act does not define initial or changed rates, and it is therefore properly the Commission's task, using its technical expertise, to draw the line between them. The courts must defer to the Commission's judgment unless the line it draws cannot be rationally reconciled with the terms of the Act." 617 F.2d 809, 814 (D.C.Cir.1980) (citing *Otter Tail Power Co. v. FERC,* 583 F.2d 399, 404 (8th Cir.1978), *cert. denied,* 440 U.S. 950, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979)). The Commission "may alter that line so long as it proceeds on a reasoned basis that is not clearly outside the statutory framework." *Id.* at 818. Because I believe FERC's classification of SWEPCO's filing as a changed rate was a reasoned

decision that comports with the Federal Power Act, I dissent.

The majority declines to review FERC's *SWEPCO* orders because it cannot discern the line the Commission has redrawn. But the Commission has clearly stated its criterion for determining what constitutes a "changed" rate filing:

[W]here transmission service is provided over the same lines for the same basic purpose, *viz.,* to transmit energy from shares of a unit commonly owned, the addition of new transmission customers shall be considered as changes to the previously filed transmission rates for such services.

*Southwestern Electric Power Co.,* 34 F.E. R.C. (CCH) ¶ 61,160 at 61,272 (1986), J.A. at 112; *see also id.* (explaining that a filing would present "initial" rates, i.e. would be "incontrovertibly new," in FERC's view if it "involved a rate for genuinely new sellers of energy to sell at wholesale to genuinely new customers").

The majority further contends that FERC failed to address SWEPCO's allegations that the service it provided under the filing "cannot reasonably be equated with the service provided to other customers," and that its filing therefore constitutes an initial rate (even under the criterion articulated by the Commission). Maj. Op. at 293. The Commission, however, based its finding that "the same formula (with some minor variations) is being applied in each case to similar transmission service" on SWEPCO's own representations in its filing. *Southwestern Electric Power Co.,* 31 F.E.R.C. (CCH) ¶ 61,389 at 61,874–75 (1985), J.A. at 77; *see* SWEPCO Filing, J.A. at 5· ("SWEPCO currently provides wholesale electric service to four customers un-

---

**18.** SWEPCO's Request for Rehearing at 7, J.A. at 88.

**19.** The dissent underscores SWEPCO's own representation that service to OMPA would be similar to service already provided to four customers; in addition, the dissent notes the Commission's explanation that service may be deemed the same even if terms and conditions vary "somewhat." *See* Diss.Op. at 2. Our problem is

with the degree of FERC's imprecision. We require of the Commission a less vague (and therefore less manipulable) explanation. To insure against evasion of *Middle South Energy,* it is incumbent on FERC to state clearly when and why it will class service variations as *de minimis* or irrelevant to the question whether the *"same* transmission service," *Southwestern,* 34 F.E.R.C. at 61,271, J.A. at 110, is being provided.

der a similar formula."). Moreover, as the Commission explained, the "fact that the terms vary somewhat, and the fact that the charges vary somewhat, are not determinative of whether it is a changed rate...." 34 F.E.R.C. ¶ 61,160 at 61,272, J.A. at 112.

With its orders, the Commission has not sought to extend its suspension and refund powers to "uncontrovertibly new" rate schedules in contravention of *Middle South Energy, Inc. v. FERC*, 747 F.2d 763, 771 (D.C.Cir.1984). Rather, it seeks to exercise its "broad ... power to characterize rates that are arguably initial as changed," *id.* Although the characterization effected here broadens the definition of changed rates and diminishes the effect of this court's decision in *Middle South Energy*, the Commission's action is permissible. I therefore respectfully dissent.